**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL NO. SAG-25-324** |
| | ) | |
| **DALYA ATTAR, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**GOVERNMENT'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS OPPOSITION, ECF NO. 82, TO MOTIONS TO SUPPRESS, ECF NOS. 57 AND 59**

The United States of America, by its undersigned counsel, submits this Supplemental Brief in Support of its Opposition, ECF No. 82, to two pending Motions to Suppress, ECF Nos. 57 (Redacted at ECF No. 84) and 59 (Redacted at ECF No. 80).

On July 28, 2026, the Court held a hearing on four motions filed by the defense: (1) Defendants' Motion to Dismiss, ECF No. 45; (2) Defendant Joseph Attar's Motion to Suppress Cell Phone Evidence, ECF No. 57; (3) Defendant Joseph Attar's Motion to Suppress Evidence Obtained through Coercion, ECF No. 59; and (4) Defendant Kalman Finkelstein's Motion to Suppress, ECF No. 67. During the hearing, the Court heard testimony from three law enforcement witnesses and from Joseph Attar. The parties also argued the Motion to Dismiss. The parties did not argue the suppression motions.

The hearing lasted an entire day, and the parties and the Court decided to schedule an additional hearing where the parties could argue the suppression motions with the benefit of the hearing transcript. The hearing is scheduled for November 13, 2026.

The Government is providing this supplemental brief in anticipation of the hearing to highlight the relevant testimony from the hearing that relates to the relevant portions of Defendant

Joseph Attar's two suppression motions. Defendant Finkelstein's Motion to Suppress only raised legal issues, and the parties did not obtain testimony as to that Motion.

**A. <u>The Office of the State Prosecutor's search of Joseph Attar's phone was reasonable.</u>**

Mr. Attar argued in his Motion to Suppress, ECF No. 84, that the OSP's search of Mr. Attar's phone was unreasonable. The Government showed otherwise in its briefing and at the July 2026 hearing.

Daniel Bralove ("Agent Bralove"), a Senior Special Agent with the Maryland Office of the State Prosecutor, seized Mr. Attar's phone pursuant to a search warrant executed on July 19, 2022. Agent Bralove testified that the Maryland State Police performed the extraction of the phone. *See* July 28, 2026, Hearing Trans., ECF No. 110 at 37.[1] Once OSP received the extraction from the Maryland State Police, Agent Bralove testified that OSP experienced "tremendous difficulties" in reviewing Mr. Attar's phone. OSP had to obtain a new computer that had the capacity to operate the Cellebrite software, but even on the new computer, Agent Bralove testified that the Cellebrite reader report "took a day or so to open."[2] *Id.* at 39. Agent Bralove further testified that that computer was the only computer that OSP possessed to review evidence in Cellebrite across all of its investigations. *Id.* at 39. Agent Bralove also testified that another OSP agent would also go to the Maryland State Police to review the image of the phone that they maintained. *Id.* at 53. Agent Bralove testified that there were "hundreds of thousands of images, tens of thousands of audio files," and that he would have to manually review each deleted item. *Id.* at 40. Agent Bralove testified that the there were no "stops and starts" to OSP's review of the evidence. *Id.* at 40.

[1] The MSP Extraction Report, shown at the hearing as Exhibit 3 states that MSP received the request for the extraction on July 19, 2022, MSP started its analysis on July 21, 2022, and MSP completed its work on August 8, 2022.

[2] Although not discussed at the hearing, the Government stated in its Brief that OSP acquired the computer in October of 2022. ECF No. 82 at 37.

John Sieracki ("Agent Sieracki"), a Senior Special Agent with OSP, also testified at the hearing. Agent Sieracki corroborated Agent Bralove's testimony. Agent Sieracki testified that:

> It was an extremely large volume of data, and we had a lot of difficulties just opening the program that allows us to go in and view the data. It would take -- sometimes it wouldn't open, just wouldn't open at all. Sometimes it would open and crash, and then sometimes it would take overnight to actually get it to open to where we could then go into the program and start looking for and reviewing, and then while we were doing that, it would often crash. When I say crash, it would freeze up. You couldn't do anything. You'd have to reboot the computer and start the process over again.

*Id.* at 72-73.

The hearing testimony confirmed that OSP faced significant hurdles when reviewing Mr. Attar's phone, and that the time, attention, and resources that they devoted to the search was reasonable under the Fourth Amendment.

**B. Law enforcement did not coerce Joseph Attar into providing his passcode.**

Defendant Joseph Attar moved to exclude evidence obtained from his cell phone because he claimed that he was coerced into providing the passcode for his phone. The witness testimony confirmed that law enforcement agents did not coerce Joseph Attar into providing his passcode.

Agent Bralove testified that he approached Mr. Attar outside of a school on foot with a uniformed Maryland State Police officer. ECF No. 110 at 23-25. Mr. Bralove was wearing a button-down shirt and khakis. *Id.* at 25. Mr. Bralove told Mr. Attar that he had a warrant for his phone, and Mr. Attar handed over his phone. *Id.* at 26. Agent Sieracki arrived shortly after Agent Bralove approached Mr. Attar. *Id.* at 29. After Mr. Bralove had completed the warrant return paperwork and handed the paperwork to Mr. Attar, he told Mr. Attar that he was free to leave. *Id.* at 28-29.

Agent Bralove testified that Mr. Attar then asked when he would receive his cell phone back. *Id.* at 29. Agent Bralove stated that Mr. Attar could get his phone back more quickly if he

provided the agents with the passcode to unlock his phone. *Id.* at 29-30. Mr. Attar agreed to provide the passcode – a symbol to be drawn on the screen – and he motioned the symbol with his hand while Agent Sieracki held the phone, and then Agent Sieracki unlocked the phone. *Id.*

The cross-examination of Agent Bralove focused on the lack of documentation about the passcode at the time of the search, but he never wavered in terms of his recollection of the events. *See id.* at 44-47. On cross-examination, Agent Bralove testified as follows:

> Q Okay. Do you, sitting here today, have a specific recollection of saying those things to Mr. Attar, or are you simply relying on what your typical procedure is or your routine procedure?
>
> A I have a specific recollection.

*Id.* at 48.

Agent Sieracki's testimony about the encounter was consistent with Agent Bralove's testimony. Agent Sieracki testified as follows:

> A After another minute or so, I guess it was Agent Bralove said he concluded the paperwork and began explaining it to Mr. Attar, asked for his signature in the required spots. I believe he said something like, "Okay, we're done" or "okay, you can leave." And then Mr. Attar asked something to the effect of how long are you going to have my phone for because -- I don't know the exact language, but it was something like, "How long are you going to have my phone for because there's a lot going on this morning" or "I need it for this morning" or something like that.
>
> Q Did Special Agent Bralove respond?
>
> A Yes.
>
> Q How did he respond?
>
> A He said something -- again, something to the effect of like "The sooner we can get into it" or "the sooner we can access it, the sooner we can get it back to you. Is there a passcode on it?" And Mr. Attar said yes.
>
> . . .

A We asked what the design was and he said, "I can show you on the phone," and I said, "No, you can't have the phone back" because we'd already seized the phone or the state police had already seized the phone. So I believe it was me, I took the phone and held it up and asked him to like -- you know, I prompted the screen so it showed the little dots on the screen and asked him to demonstrate what it was but not touch the phone. In front of it, six or eight inches away, kind of made the symbol, which to me it resembles like the L for Lexus where it's kind of a forward leaning L.

Then I took my finger and did it over top of the device and it unlocked it, and then I handed the phone back to Dan or Agent Bralove.

*Id.* at 64-66. Agent Sieracki's cross-examination was similarly limited to the lack of contemporaneous documentation related to the passcode. *See id.* at 80.

Mr. Attar's testimony on this issue was not credible. On direct examination, he testified that Agent Bralove asked for his passcode twice and told him "Per the court order, you have to" give the passcode. *Id.* at 153. On cross-examination, Mr. Attar testified that he was originally approached by Agent Bralove and an unidentified law enforcement officer, with the Maryland State Police officer behind them, and that the unidentified law enforcement officer was not Agent Sieracki. *Id.* at 162-63. No witness testimony or documentation supports the presence of this unidentified law enforcement officer.

Law enforcement also interviewed Mr. Attar the same day that they seized his cell phone. During that interview, which was recorded, Mr. Attar falsely told law enforcement that: (1) he did not know why Victim 1 was coming to town; (2) that he never recorded anyone without their knowledge; (3) that he never showed Victim 2 anything at the meeting at Greenspring Station; and (4) that he did not bring anyone with him to the meeting at Greenspring Station with Victim 2. The Government cross-examined him about these false statements at the July 2026 hearing. As to the meeting with Victim 1, Mr. Attar testified as follows:

Q Did you initially tell them you had no clue why victim 1 was coming to town?

A Did I originally -- I don’t remember what I told them exactly. I never listened to the interview.

. . .

Q Okay. Did you initially tell them you had no clue why victim 1 was coming to town?

A I may have.

Q So you weren't sure before, but now you may have told them?

A I may – I’m still not sure, but I may have told them that. That's something I may have -- I would have told them.

Q Did you tell them that it was victim 1 that had requested the sit-down meeting?

A I don’t remember.

*Id.* at 166-67. As to recording someone without their knowledge:

Q Did you tell them you never recorded anyone without their knowledge?

A Yes.

*Id.* at 167. As to showing Victim 2 something during the meeting:

Q Did you tell them that you’d never shown victim 2 anything at the meeting you had at Greenspring Shopping Center? Did you tell them that?

A I don’t remember.

Q You don't remember if you told them that one?

A No.

*Id.* at 168. As to whether he brought someone with him to the meeting with Victim 1:

Q Okay. Did you say that you didn't bring anybody else to that meeting at Greenspring with victim 2?

A I don’t remember.

Q You don’t remember if you told them that?

A No.

Q Do you remember if you later admitted that you brought somebody there, but you told them that that person waited outside? Do you remember that?

A I didn't have the conversation with them later.

Q Do you remember during – I'm just trying to spare us the 19 minutes of listening to it. Do you remember telling the investigators that you didn't bring somebody else to the meeting at Greenspring Station and then later saying, well, you did but that person waited outside. Do you remember telling them that?

A I probably initially thought they were referring to someone sitting down next to me as part of the conversation in the meeting, and then when they clarified it, I remember that someone was there not to see -- be part of the meeting but just to be out there, outside. That's probably what the discrepancy was.

Q That person was there for what reason?

A He was with me.

Q Was he there for protection?

A He was there -- he was with me. Yeah, he was there for protection, yes.

Q And that's what you admitted on the interview after you told the different story for a while?

A Well, I didn't tell a different story. Originally I said that no one was part of the meeting.

*Id.* at 168-69 (emphasis added).

The testimony from Agents Bralove and Sieracki confirm that Mr. Attar voluntarily provided his passcode so that he could get his phone returned to him as soon as possible. Mr. Attar's version of events is not corroborated by any other testimony or documents, and his cross-examination demonstrated both memory and credibility issues.

Finally, the Government also argued in its briefing that, even if law enforcement had obtained Mr. Attar's passcode by coercion, the Court should not suppress the evidence because of the "inevitable discovery" doctrine. ECF No. 82 at 47-48. The Government argued that, even if Mr. Attar never provided his passcode, law enforcement still would have been able to extract the information from his phone. *Id.* At the hearing in July, the Government called Christopher Cobleigh, a Digital Forensics Examiner for the Maryland State Police. Mr. Cobleigh testified that, based on the type of phone (Samsung S21 with Android operating system) and the extraction software (Cellebrite Premium), he "likely" would have been able to discover the passcode through "brute force." ECF No. 110 at 129. Mr. Cobleigh further testified that he also used the GrayKey software to extract information from Mr. Attar's phone, and that the GrayKey software obtained the extraction with "brute force," without the use of Mr. Attar's passcode. *Id.* at 130. Law enforcement did not need Mr. Attar to voluntarily provide his passcode, and the extraction of his phone consistent with the warrant was inevitable.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

By: _______/s/_______________
Matthew P. Phelps
Reema Sood
Assistant United States Attorneys
36 S. Charles Street, 4th Floor
Baltimore, Maryland 21201
Matthew.phelps@usdoj.gov
Reema.sood@usdoj.gov
(410) 209-4800